24CA0151 Enterprise v ICAO 10-03-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0151
Industrial Claim Appeals Office of the State of Colorado
WC No. 4-753-828

Enterprise Claims Management, Inc., and Cannon Cochran Management
Services,

Petitioners,

v.

Industrial Claim Appeals Office of the State of Colorado and Fozia H. Mohamed,

Respondents.

ORDER AFFIRMED

Division III
Opinion by JUDGE DUNN
Navarro and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 3, 2024

Dworkin, Chambers, Williams, York, Benson & Evans, PC, Gregory K.
Chambers, Denver, Colorado, for Petitioners

No Appearance for Respondent Industrial Claim Appeals Office

Kaplan Morrell, LLC, Michael H. Kaplan, Greeley, Colorado, for Respondent
Fozia H. Mohamed

¶ 1     In this workers' compensation action, Enterprise Claims Management, Inc., and its insurer, Cannon Cochran Management Services (collectively, employer), seek review of the final order issued by the Industrial Claim Appeals Office (the Panel) affirming the award of reasonably necessary medical benefits to claimant Fozia H. Mohamed.  Under the circumstances presented here, we affirm.

## I.     Background

### A.     The Work-Related Injury and Permanent Total Disability

¶ 2     While working alone at a gas station at night, Mohamed was robbed at gunpoint two different times.  After the first robbery in 2007, Mohamed returned to work, though she experienced some anxiety and became more vigilant.  But in 2008, two men again robbed the gas station and this time held a gun to Mohamed's head and pulled the trigger (though the gun didn't discharge).  After this robbery, Mohamed was diagnosed with post-traumatic stress disorder (PTSD).

¶ 3     As a result of her PTSD, Mohamed experienced anxiety, panic attacks, chronic fear, depression, insomnia, nightmares, hyperarousal, hypervigilance, agoraphobia, and avoidance

behaviors.  And because being alone exacerbated her symptoms, since the second robbery Mohamed has relied on the presence of others to make her feel safe.

¶ 4     Despite years of therapy, medication, and attempts at desensitization, Mohamed's PTSD symptoms persisted.  Thus, in 2014, an administrative law judge (ALJ) determined that Mohamed was permanently and totally disabled and awarded her permanent total disability benefits.  Employer filed a final admission of liability, admitting to Mohamed's permanent total disability and authorizing continuing maintenance care that was reasonably necessary and related to the injury.  Mohamed continued to receive maintenance care for the next several years.

### B.     Request for Additional Medical Treatment

¶ 5     In 2022, Mohamed filed an application for a hearing, seeking reasonably necessary medical benefits.  As relevant here, Mohamed asked that employer pay for daily attendant services because she

experiences terror and decompensates when she is alone.[1]

Mohamed sought attendant services only to manage her PTSD and prevent her symptoms from flaring, not for assistance with activities of daily living such as cooking, cleaning, or personal care. But she did request accompanied transportation because her panic attacks made her an unsafe driver.

### C. The Hearing

¶ 6    At a hearing on her application, Mohamed presented evidence about her PTSD symptoms. She testified that before the armed robberies she was independent, could drive, and had no problem being alone. But since the robberies, she testified that she experiences depression, anxiety, and panic attacks when alone. She explained that when she is with someone the fear and panic subside and she feels safe. And she testified that she lives with one of her three adult children because she can't be alone.

---

[1] Mohamed also requested that employer pay for a full-time independent living facility. The ALJ determined that Mohamed failed to prove such long-term care "is reasonably necessary at this time" and dismissed her request as premature. Mohamed didn't challenge that determination, and we don't address it here.

¶ 7   Mohamed's three adult children also testified. The children collectively stated that, for the past thirteen years, they've each spent between twenty and sixty hours a week supporting Mohamed. They confirmed that Mohamed struggles to be alone for any length of time, can't be alone in public or at night, and isn't safe to drive due to panic attacks. They also explained how they coordinate their schedules to provide near-constant support to Mohamed, whether by phone calls, companionship, running errands, or providing transportation. And each child detailed how Mohamed deteriorates when she is even temporarily alone and how her symptoms improve when someone is with her.

¶ 8   Mohamed next presented Dr. Walter Torres as an expert in clinical and forensic psychology. He treats patients with PTSD and first diagnosed Mohamed with PTSD in 2009. Dr. Torres reevaluated Mohamed in 2022 and diagnosed her with chronic PTSD (and an adjustment disorder with depressed mood). He explained that a core symptom of PTSD is "re-experiencing" the traumatic event, and that because Mohamed was alone during both robberies, being alone causes her to re-experience the "terror" of the robberies. He observed that, while alone, Mohamed

"decompensates" and "becomes disorganized" and "overwhelmed," which is "immensely stressful emotionally and physically." And he opined that Mohamed's aversion to being alone is not merely a "preference" but rather a "profound intolerance of aloneness." He testified that providing Mohamed with attendant services would relieve the "trigger" of aloneness and recommended such care for ten to twelve hours a day for an indefinite duration.

¶ 9 Employer countered with Dr. Timothy Shea, also an expert in clinical psychology. Dr. Shea evaluated Mohamed and agreed that she has PTSD. He opined, however, that attendant services were not clinically indicated because, in his view, Mohamed was "behaviorally limiting herself" and "[a]ccommodating the behavioral avoidance has only contributed to a greater reliance on others." Instead, he recommended that Mohamed become more independent and physically active, though he admitted that Mohamed's symptoms "are relieved when somebody is with her" and that being alone exacerbates her PTSD symptoms.

¶ 10 The ALJ also reviewed reports from Dr. Howard Entin, who has treated Mohamed since 2009. In a 2022 report, Dr. Entin noted that despite years of treatment and medication, Mohamed

5

still experienced PTSD symptoms, was avoidant and vigilant in public, and relied on the presence of others to make her feel safe. He opined within a reasonable degree of medical probability that part of Mohamed's "need" to be with others resulted from the two robberies.

¶ 11    Crediting Dr. Torres and Dr. Entin, the ALJ found that Mohamed had proved that attendant services are a "reasonably necessary and causally related medical treatment to prevent further exacerbations and flare up" of her continuing chronic and severe PTSD. The ALJ therefore concluded that employer "shall authorize and pay" for up to twelve hours of daily attendant care as maintenance treatment for Mohamed's work-related PTSD.

¶ 12    In so holding, the ALJ rejected employer's argument that attendant services were not compensable because, in employer's view, such services were neither medical in nature nor incidental to other medical treatment. The ALJ explained that, because Mohamed requested attendant services to treat symptoms that are causally related to her work-related PTSD, the services were a medical treatment and were "clearly part of her maintenance treatment in order to maintain maximum medical improvement and

6

prevent flare-ups or aggravation of her PTSD." And as to maintenance care specifically, the ALJ recognized that in its final admission of liability employer had authorized continuing maintenance care that was reasonably necessary and related to Mohamed's injury.

¶ 13    On appeal, the Panel recognized that ongoing medical benefits may be awarded after maximum medical improvement when substantial evidence supports a determination that future treatment is reasonable and necessary to relieve the effects of the injury or prevent a deterioration of a condition. The Panel affirmed the ALJ's order, concluding that it was "supported by substantial evidence and applicable law."

## II.    Analysis

¶ 14    Employer maintains that attendant services aren't a compensable medical treatment under the Workers' Compensation Act of Colorado (the Act). Under the circumstances here, we disagree.

¶ 15    The Act provides a range of benefits to employees injured on the job. *See generally* §§ 8-42-101 to -127, C.R.S. 2024. An employer is specifically required to provide an injured employee

"medical, surgical, dental, nursing, and hospital treatment . . . as may reasonably be needed . . . to cure and relieve the employee from the effects of the injury." § 8-42-101(1)(a)(I); *see Colo. Comp. Ins. Auth. v. Nofio*, 886 P.2d 714, 716 (Colo. 1994).

¶ 16     We review de novo whether the ALJ and the Panel correctly applied the law. *See Fisher v. Indus. Claim Appeals Off.*, 2021 COA 27, ¶ 14; § 8-43-308, C.R.S. 2024.

¶ 17     As we understand it, employer argues that because the requested attendant services aren't provided by someone with "specific medical training," those services aren't a directly compensable "medical" treatment under section 8-42-101(1)(a)(I). But nothing in the statute's plain language requires that medical treatment be provided by a skilled provider or someone with medical training. Rather, the statute requires only that the medical treatment "cure and relieve the employee from the effects of the injury." § 8-42-101(1)(a)(I). And construing the plain language that way, divisions of this court have concluded that nonskilled services that cure or relieve an employee's work-related injury may be compensable medical treatment under section 8-42-101(1)(a).

8

¶ 18    For example, in *Suetrack USA v. Industrial Claim Appeals Office*, 902 P.2d 854 (Colo. App. 1995), the claimant's wife provided him with home attendant services, such as assisting him into and out of bed, helping him walk and exercise, and maintaining his hygiene and cleanliness. *Id.* at 855. An ALJ awarded compensation for the wife's services, and the Panel affirmed. *Id.* On appeal, the employer argued that the attendant services weren't compensable because the wife was not a licensed healthcare provider as required by other state regulations. *Id.* A division of this court rejected this argument, concluding that the spouse's attendant services were compensable because, as the ALJ had found with substantial evidentiary support, such services were reasonably necessary to treat the claimant's work-related injury. *Id.* at 855-56. As the division observed, even "legally recognized nonmedical treatment" is compensable so long as it's "reasonably necessary to relieve claimant from the effects of an industrial injury." *Id.* at 855; *accord Riley Fam. Tr. v. Hood*, 874 P.2d 503, 504 (Colo. App. 1994).

¶ 19    Similarly, in *Bellone v. Industrial Claim Appeals Office*, 940 P.2d 1116 (Colo. App. 1997), the claimant, a single parent, experienced a work-related head injury that caused seizures,

9

extreme fatigue, depression, mental confusion, and a sleep disorder. *Id.* at 1117-18. In addition to other medical treatment, the claimant's provider prescribed childcare services to permit the claimant to attend medical appointments and to rest during the day. *Id.* The employer refused to pay for childcare services for the purpose of allowing the claimant to rest or engage in other nonmedical appointment activities. *Id.* An ALJ awarded the childcare services, but the Panel reversed, determining that the childcare services weren't compensable because they were neither medical in nature nor incidental to obtaining necessary medical treatment. *Id.* A division of this court disagreed, concluding that the childcare services were medical in nature because, as the ALJ had found with substantial evidentiary support, the services relieved the symptoms of the claimant's work-related head injury and were directly associated with claimant's physical needs.[2] *Id.* at 1118; *cf. Kuziel v. Pet Fair, Inc.*, 931 P.2d 521, 522-23 (Colo. App.

---

[2] Though not relevant for our purposes, the division in *Bellone* alternatively concluded that the childcare services were incidental to medical treatment, and therefore compensable, because the services were provided as part of an overall home healthcare program designed to treat the claimant's condition. *Bellone v. Indus. Claim Appeals Off.*, 940 P.2d 1116, 1118 (Colo. App. 1997).

10

1996) (holding that childcare services weren't a compensable medical benefit because, among other things, the services didn't relieve the symptoms or effects of the work-related injury and weren't directly associated with the claimant's physical needs).

¶ 20    Collectively, these cases indicate that a treatment is "medical" in nature — even if inherently nonmedical or provided by someone without medical training — so long as the treatment is reasonably necessary to relieve the symptoms of a claimant's work-related injury. Thus, the unskilled attendant services requested by Mohamed could be a compensable medical treatment if reasonably necessary to relieve the symptoms of her work-related PTSD.

¶ 21    And whether a particular requested service is medically necessary to treat a claimant's work-related injury (or incidental to obtaining other treatment) is a factual question. *E.g., Bellone*, 940 P.2d at 1117. We must uphold the ALJ's factual findings if substantial evidence supports them. *Fisher,* ¶ 14; § 8-43-308.

¶ 22    On this factual question, the ALJ found that the attendant services were causally related to Mohamed's work-related PTSD and reasonably necessary to prevent the exacerbation and flareup of her

PTSD symptoms. As detailed above, these findings are supported by substantial record evidence and testimony that showed that

- as a result of her PTSD, Mohamed struggles to be alone for any length of time, can't leave the house alone, and isn't safe to drive;

- to avoid being alone, Mohamed primarily relies on the presence and aid of her three adult children, who have each dedicated between twenty and sixty hours a week to supporting Mohamed since her injury in 2008;

- when alone, Mohamed re-experiences the trauma underlying her injury, which worsens her PTSD symptoms, causes her to decompensate, and is physically and emotionally stressful for her;

- when in the presence of others, Mohamed's PTSD symptoms improve and she feels safe; and

- the requested attendant services would prevent Mohamed from being alone and thus relieve the symptoms of her work-related PTSD.

¶ 23    To the extent that employer argues that other inferences could be drawn from the evidence, it's the ALJ's province — not ours — to

resolve disputed factual issues and to determine witnesses' credibility, the weight to accord testimony, and the inferences to be drawn from the evidence. *See Metro Moving & Storage Co. v. Gussert*, 914 P.2d 411, 415 (Colo. App. 1995) (We must "defer to the ALJ's credibility determinations and . . . resolution of conflicts in the evidence, including the medical evidence.").

¶ 24    We aren't persuaded otherwise by employer's related contention that the attendant services aren't compensable because they aren't incidental to other medical treatment. *See, e.g., Country Squire Kennels v. Tarshis*, 899 P.2d 362, 363-64 (Colo. App. 1995) (collecting cases). Under these unique circumstances, the requested attendant services aren't incidental to the medical treatment that relieves Mohamed's symptoms (such as housekeeping services); rather, the attendant services are the treatment that relieves Mohamed's symptoms. And Dr. Torres — whose testimony the ALJ expressly credited — clarified that he recommended attendant services "solely" for "Mohamed's work-related psychological condition" and not "to help her with . . . cleaning the bathroom and cooking, for example." Thus, as the ALJ and the Panel correctly identified, the requested attendant services

are a directly compensable medical treatment because those services are causally related to Mohamed's work-related PTSD and reasonably necessary to relieve her PTSD symptoms.

¶ 25    All this said, we see no legal error with the ALJ's or the Panel's application of section 8-42-101(1)(a)(I). And because substantial evidence supports the ALJ's findings that unskilled attendant services are causally related to Mohamed's work-related PTSD and reasonably necessary to prevent the exacerbation and flareup of her symptoms, the Panel didn't err by affirming the ALJ's order.[3]

## III.    Disposition

¶ 26    We affirm the Panel's order.

JUDGE NAVARRO and JUDGE GOMEZ concur.

---

[3] The ALJ also found that the attendant services are "clearly part of [Mohamed's] maintenance treatment in order to maintain maximum medical improvement and prevent flare-ups or aggravation of her PTSD." *See Grover v. Indus. Comm'n*, 759 P.2d 705, 710 (Colo. 1988) (discussing entitlement to medical maintenance benefits after maximum medical improvement). And employer admitted in its final admission of liability that Mohamed was entitled to maintenance benefits. This seems to be a separate basis of compensability that employer doesn't appear to challenge or address. *See* § 8-43-201(1), C.R.S. 2024 (specifying the party seeking to modify an issue determined by a final admission of liability bears the burden of proof).